[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-12199

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 10, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 06-00860-CV-CG-M

DAVID W. CORBITT,
ALEXANDER J. RAYA, JR.,

Plaintiffs-Appellants,

versus

HOME DEPOT U.S.A., INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(July 10, 2009)

Before WILSON and COX, Circuit Judges, and FAWSETT,* District Judge.

_____

* Honorable Patricia C. Fawsett, United States District Court for the Middle District of
Florida, sitting by designation.

WILSON, Circuit Judge:

The plaintiffs, David Corbitt and Alexander Raya (collectively, "Appellants"), appeal the entry of summary judgment in favor of the defendant, Home Depot U.S.A., Inc. ("Home Depot"), on their sexual harassment and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17, and their state law claims of assault and battery, outrage, and invasion of privacy. This action arose from the Appellants' employment with and termination from Home Depot. The Appellants asserted claims of sexual harassment and retaliation in violation of Title VII, claiming that Home Depot's regional human resources manager, Leonard Cavaluzzi, sexually harassed them and subjected them to a hostile work environment from approximately March of 2005 until mid-November of 2005, and that they were terminated on December 13, 2005 in retaliation for reporting the alleged sexual harassment. Home Depot denied their sexual harassment claim and stated that even if the alleged conduct occurred, the allegations did not rise to the level of sexual harassment under Title VII and did not constitute the intentional torts of assault and battery, outrage, or invasion of privacy. According to Home Depot, the Appellants were lawfully terminated for repeated violations of Home Depot's policies.

In granting Home Depot's motion in part,[1] the district court concluded that the Appellants did not demonstrate that they were subjected to objectively severe or pervasive harassment so as to constitute a hostile work environment. In the alternative, the district court found that Home Depot exercised reasonable care to prevent and correct any sexually harassing behavior and that the Appellants unreasonably failed to take advantage of these corrective measures or to avoid any harm.

In addition, the Appellants challenge the district court's conclusion that they did not demonstrate retaliation because they failed to provide sufficient evidence of a causal connection between their complaints of sexual harassment and their eventual terminations. They also contend that the district court erred in finding that they did not provide evidence showing that Home Depot's asserted reasons for terminating their employment were merely pretext for retaliation.

Finally, the Appellants assert that the district court erroneously found that they failed to demonstrate conduct sufficient to constitute the state law torts of outrage or invasion of privacy and that they had failed to show a proper basis for Home Depot's liability for the intentional torts of one of its employees.

---

[1] The motion was granted in part and denied in part. The parties have since settled the claims for which summary judgment was denied: negligent training, supervision, and retention. Therefore, these claims are not the subject of the present appeal.

After reviewing the record and hearing the arguments of the parties, we affirm summary judgment on the claims of hostile work environment sexual harassment, assault and battery, invasion of privacy, and outrage, and reverse on the claim of retaliation.

## I. BACKGROUND

*A.    Facts[2]*

A detailed recitation of the facts is necessary to properly analyze the various issues.

*1.    Cavaluzzi's Transfer to Corbitt and Raya's Region*

In March of 2005, Leonard "Lenny" Cavaluzzi, a regional human resources manager for Home Depot, was transferred to a new region of Home Depot. At the time of this transfer, Cavaluzzi reported directly to Lisa Keglovitz, the regional human resources director, who remained his direct supervisor throughout the events material to this case. Cavaluzzi acted as a business partner to the district managers in his new region, including district manager Leon McLaughlin. Cavaluzzi was based in Jacksonville, Florida during this time.

---

[2]    These facts are stated for purposes of reviewing the district court's grant of summary judgment and should not be construed as findings of fact. In setting forth these facts, we bear in mind that a court deciding a motion for summary judgment must consider all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and must resolve all reasonable doubts against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986).

Within the month of his transfer, Cavaluzzi purportedly began making inappropriate sexual overtures to two store managers at Home Depot locations within his region in Mobile, Alabama and Pensacola, Florida: David "Dave" Corbitt and Alexander "Alex" Raya. Cavaluzzi allegedly made repeated telephone calls of a sexual nature and inappropriately touched Corbitt and Raya. The calls ranged from two to three times a week to twelve times a week from March to November of 2005.

2. *Allegations of Harassment*

a. *Telephone Calls*

Corbitt was the store manager for a Home Depot location in Mobile, Alabama. Raya was the store manager for a Home Depot location in Pensacola, Florida. Corbitt and Raya assert that both Cavaluzzi and McLaughlin were their supervisors.

Cavaluzzi's initial telephone call to Corbitt occurred around the third week of March when Corbitt was in his store manager's office with two employees. Cavaluzzi called, and Corbitt answered on the speaker phone. Cavaluzzi invited Corbitt to be with him at his hotel, while Cavaluzzi was in Mobile the next week.

Corbitt alleges that telephone calls occurred every week for approximately nine months from March until after the middle of November. According to Corbitt, at first Cavaluzzi's telephone calls began as business-related and then would devolve into statements of a sexual nature, but the calls soon became entirely personal. For

5

instance, Cavaluzzi stated that Corbitt was not Cavaluzzi's "usual type," but he "could not stop thinking about" Corbitt; that Cavaluzzi knew Corbitt was not gay, but Cavaluzzi could show Corbitt how, and he would "like it;" that Cavaluzzi liked Corbitt's "baby face;" and that Corbitt was "small and cute." In addition, Cavaluzzi said he liked how small Corbitt was and the way he dressed, that he liked Corbitt's dark tan, and asked if Corbitt "wore boxers or briefs or nothing." He asked if Corbitt colored his hair and remarked that it must be Corbitt's "natural color down there too." He asked whether Corbitt shaved his full body, stating that it looked as though Corbitt shaved his arms. He repeatedly asked Corbitt if he "wasn't bored with the same woman," referring to Corbitt's wife, asked if Corbitt and his wife "swing," and told Corbitt to visit specified gay websites, saying Corbitt "should look at them" so Corbitt "could see what he is talking about."

At the same time, Cavaluzzi was allegedly engaging in similar behavior to Raya. Cavaluzzi's telephone calls to Raya also began in the third week of March. The telephone calls occurred several times a week from March until November of 2005. Cavaluzzi called Raya several times a week, asking such things as what Raya was wearing and if he was wearing the pants that Cavaluzzi liked. Cavaluzzi stated that Raya "always dressed so nice" and "was cute." Cavaluzzi would tell Raya that he was going to be in town and asked when Raya was working and getting off work.

He asked whether Raya was happily married, remarked that Raya's hair was beautiful, and stated that he liked Raya's green eyes. He told Raya, "I like the rough look," and "I like your temper." He also told Raya, "you're the Italian heifer that I like." He repeatedly asked Raya to meet him for drinks.

       b.     *Physical Contact*

Corbitt and Raya stated that they were subjected to unwanted physical touchings by Cavaluzzi. Around the fourth week of March, there was a round table Home Depot meeting at the Hampton Inn in Pensacola of all store managers and human resources managers in the district. Store human resources manager Donna Calhoun saw Cavaluzzi touch both Corbitt and Raya, going from one to the other. Cavaluzzi walked into the room and massaged their necks and shoulders, made comments about their hair, played with their hair, and hugged Corbitt and Raya in front of the store managers and human resources managers of the district. Both men moved away from Cavaluzzi. According to Corbitt, McLaughlin and others observed this incident.

That evening, Cavaluzzi called Corbitt at home and asked Corbitt to bring assistant manager files to Cavaluzzi at the Pensacola Home Depot. When Corbitt pulled into the parking lot, Cavaluzzi reached into Corbitt's car and began massaging

Corbitt's neck and shoulders. Cavaluzzi invited Corbitt to join him at his hotel for a couple of drinks. Corbitt refused.

Cavaluzzi's behavior offended and humiliated Corbitt, but he acquiesced because Cavaluzzi was his boss, and Cavaluzzi had a reputation for being vindictive. Corbitt did not feel that he had to specifically tell Cavaluzzi to stop touching him because Cavaluzzi was his superior and should have known that this was wrong.

Around the same time, Raya was in the training room at the Daphne, Alabama store seated at a table with another employee, when Cavaluzzi came into the room. Cavaluzzi sat down next to Raya, put his arm on Raya's shoulder "like [Cavaluzzi] was [Raya's] best friend in the world" and put his hand on Raya's thigh under the table. Raya moved his chair away from Cavaluzzi and stood up. Cavaluzzi then stood for a few seconds and stated, "I just wanted to let you know I'm here" and walked out of the room.

Within a month after this incident, Raya attended a training meeting at the Pensacola Hampton Inn. In front of nine or ten store managers, Cavaluzzi came up behind Raya and began running his fingers through Raya's hair.

In June, Home Depot held a grand opening at the new Pensacola store, at which Raya made a presentation in front of approximately 200 contractors. After completing his speech, as Raya walked down from the podium, McLaughlin extended

8

his hand to congratulate Raya. Before Raya could shake McLaughlin's hand, Cavaluzzi moved in front of McLaughlin and told Raya that he was proud of him. Cavaluzzi then gave Raya a hug and massaged Raya's back. Raya testified that Cavaluzzi pressed his whole body against Raya, such that Cavaluzzi's body was touching Raya's "privates" during the hug.

In August, Corbitt was working alone in the training room of the Montlimar store when Cavaluzzi "snuck up" behind him, put one of his hands on Corbitt's shoulder, and rubbed Corbitt's stomach with the other. Corbitt pulled away.

At an August meeting, Cavaluzzi massaged Raya's neck and shoulders while commenting that Raya was in good shape and felt muscular and trim. He complimented Raya's physical build and asked Raya if he worked out. Raya walked out. This was the last physical contact between Cavaluzzi and Raya.

At a November meeting, when Corbitt entered the room, he stuck out his hand to shake hands with Cavaluzzi, but Cavaluzzi pushed Corbitt's hand to the side and instead gave Corbitt a hug. Before Corbitt could pull away, Cavaluzzi started rubbing Corbitt's back, neck, head, and shoulders. When Corbitt pulled away from Cavaluzzi, Cavaluzzi asked, "How are you doing?" Corbitt responded that he was cold, and Cavaluzzi said, "Maybe we should cuddle later." This was the last physical contact between Cavaluzzi and Corbitt.

### 3. *Home Depot's Harassment and Non-Discrimination Policy*

Home Depot has a harassment and non-discrimination policy which provides the following:

Introduction

Every Home Depot associate should be able to work in an environment that is free of discrimination and harassment. In order for such an environment to exist, each of us must play a role. Management must take a proactive role in setting and enforcing appropriate standards of behavior, and all associates must behave in accordance with those standards.

Policy

Home Depot is committed to ensuring that associates work in an environment of mutual respect that is free of harassment and discrimination.

\* \* \*

Home Depot does not tolerate harassment of any kind of the basis of race, color, sex (gender), age, religion, national origin, sexual orientation, disability, protected veteran status, or any other basis prohibited under applicable law.

Home Depot defines sexual harassment as any unwelcome or unsolicited behavior of a sexual nature that denies an associate the right to a non-offensive, work atmosphere.

The policy establishes the following procedures for reporting harassment:

| *If an associate . . .* | *then the associate should . . .* |
|---|---|

| | |
|---|---|
| • [b]elieves he or she is the victim of discrimination or is being harassed or exposed to conduct that is offensive[,] | • [t]ell the person to stop the conduct immediately and contact a member of management. |
| • [d]oes not feel comfortable discussing the problem with a particular manager[,] | • [c]ontact the Store Manager, District Manager, Store Human Resource[s] Manager, Division Human Resources Manager, Employment Practices Manager, or HR Vice President. |
| • [w]ants to report harassment or discrimination but wants to remain anonymous[,] | • [c]all the Aware Line at 1-800-286-4909 to report harassment and discrimination.[3] |

If a manager receives a complaint, becomes aware of or even suspects a violation of the Company's harassment and non-discrimination policy, that manager has a responsibility to consult promptly with a member of Human Resources Management for a proposed course of action. Anyone who condones or fails to take appropriate action is violating Home Depot's harassment and non-discrimination policy.

When Managers/Supervisors Fail to Comply with These Requirements

These requirements must be followed. Managers/supervisors who deviate from the requirements are subject to discipline up to and including termination. Exceptions to this SOP must be approved by the Human Resources Vice President (or equivalent) of the business unit.

The record reflects that both Corbitt and Raya were familiar with this policy. Because Cavaluzzi was the regional human resources manager, the person in charge of enforcing Home Depot's policies at the regional level, we infer that he was familiar with this policy as well.

---

[3] This section of the policy has been reformatted for clarity.

### 4. Reports of Harassment

Raya first discussed Cavaluzzi's conduct with Donna Calhoun in April. Calhoun was a store human resources manager, one of the persons listed in the Home Depot policy to be contacted in a case of sexual harassment when an employee does not feel comfortable discussing it with other managers.

In June, Corbitt also contacted Calhoun about Cavaluzzi's conduct. Corbitt testified that he feared for his job and did not want Calhoun to make a formal complaint about Cavaluzzi's conduct. Corbitt hoped Calhoun would be able to do something about Cavaluzzi's harassment without Corbitt losing his job. He did not want Calhoun to anger Cavaluzzi, but he wanted the inappropriate behavior to stop.

In June, Calhoun spoke directly with Cavaluzzi, who was her boss, about his conduct. She told Cavaluzzi that Corbitt and Raya were uncomfortable with his behavior and felt that he was sexually harassing them; that Cavaluzzi should stop this behavior; and that if he did not, it was likely to become a formal issue.

Between June and December 13, 2005, the date when both Corbitt and Raya were fired, Calhoun talked to Cavaluzzi on at least four separate occasions about his inappropriate behavior toward the two store managers. She testified that Cavaluzzi's response was that her concerns were ridiculous.

Other complaints were made to managers at Home Depot concerning Cavaluzzi's actions. In August, Raya told Rich Edgeworth, a store human resources manager, that he wanted to file a formal complaint, even though he felt that he would be fired. Edgeworth agreed to report Cavaluzzi's actions. Although Edgeworth quit his job before making the report, Edgeworth told Calhoun that since he was no longer an employee of Home Depot, it was up to her to do what was necessary about Cavaluzzi's behavior. Further, after complaining to Calhoun in June, Corbitt complained directly to McLaughlin in the fall of 2005.

In addition, at some point after his complaint to Edgeworth and before he was terminated, Raya received a report from his store human resources manager, Susan Parker, about statements that Cavaluzzi had made to her, such as that Cavaluzzi was "going to get" Raya, Raya's "days were numbered," and Raya was "not out of the woods." She also told Raya that "Lenny had a hard-on for him," which she stated meant that Cavaluzzi had it in for Raya. Additionally, Parker reported that Cavaluzzi had instructed her to have Raya call Cavaluzzi directly if Raya had a problem with Cavaluzzi's comments.

Before Raya called Cavaluzzi, however, he placed a call to McLaughlin to explain what had happened and to advise that he was going to call Cavaluzzi. Raya decided it would be wise "to partner with" his district manager to resolve the

13

problem; therefore, he told McLaughlin of Cavaluzzi's sexual comments and that Cavaluzzi's threats were being made because Raya had refused Cavaluzzi's sexual advances. McLaughlin told Raya not to call Cavaluzzi and chastised Parker for repeating Cavaluzzi's comments to Raya.

On November 18, 2005, Corbitt and Raya directed Calhoun to do whatever had to be done to make Cavaluzzi stop his inappropriate behavior. Calhoun later told both Corbitt and Raya that she had filed complaints on their behalf.

Because Calhoun was warned by Cavaluzzi never to go over his head, Calhoun reported his inappropriate behavior to one of Cavaluzzi's "business partners" in the region, McLaughlin, who was on a level equal to Cavaluzzi. When all her efforts to get Cavaluzzi to stop harassing Corbitt and Raya failed, including reporting the harassment to McLaughlin, she called the Aware Line, as specified in Home Depot's policy, and reported Cavaluzzi's sexual harassment. After the Aware Line complaint was made in late November, Cavaluzzi ceased harassing both Corbitt and Raya.

5.      *Terminations of Corbitt and Raya*

Less than one month after a formal complaint had been made to McLaughlin and Calhoun reported the sexual harassment on Home Depot's Aware Line, Corbitt and Raya were terminated as employees of Home Depot. The terminations occurred

14

at two different meetings attended by Cavaluzzi and McLaughlin separately with Corbitt and Raya.

Right after these terminations occurred, Cavaluzzi called Calhoun, about which Calhoun testified as follows:

A:   I got a call from Lenny, it was mid morning, he was quite happy, he was calling to let me know that he had gotten Dave and that Dave and Alex had both been fired, and he went into detail about they had been called to a store, the Pensacola store, and they had been brought in there separately and they had been terminated. And their wives were in the pa[r]king lot or somebody's wife was in the parking lot, and he thought that was hilarious. I mean, he just–he went into a lot of detail that–definitely he received pleasure from what he was doing and almost was happy that he was being able to report it to me. It was–

Q:   Did Mr. Cavaluzzi take credit for their terminations?

A:   Yes, he did.

Q:   Would you say he bragged about it?

A:   Oh, he was definitely bragging about it. He laughed.

In addition, Raya testified that Cavaluzzi told Raya that he had been involved in the investigation which led to the terminations of Corbitt and Raya. When Raya reviewed the investigative file, he found confirmation of Cavaluzzi's claim in a document which listed Cavaluzzi's name as the investigator.

Cavaluzzi described the terminations of Corbitt and Raya as group decisions, with every person in the group, including himself and McLaughlin, having input.

15

However, he also explained that "[the Home Depot executives] don't put it on us to make the [termination] decision[s]; that's their decision." Because both Corbitt and Raya had tenure with Home Depot due to their ten years or more of employment and because both were store managers, Cavaluzzi and McLaughlin had to obtain approval for the terminations from corporate officers at a level higher than their district/regional management level. Corbitt and Raya claim that the vehicle that Cavaluzzi and McLaughlin used for achieving the terminations was an investigation by Michael "Mike" Hall, then a district loss prevention manager, of markdown practices that had purportedly been uncovered in early 2005.

Hall's job in loss prevention included investigating theft and any other practices that could cause losses in all Home Depot stores within his district. Hall's investigation began in the spring of 2005, and he allegedly uncovered questionable markdowns and discounted sales to customers, employees, contractors, and a competitor. During the investigation, Hall coordinated his efforts with the district manager, McLaughlin. Hall explained that he was a "business partner" of McLaughlin in the district: "He was my business partner, and I had to make sure that he was kept apprised of issues I'd find in the area. . . . We looked at each other as peers. I was in the same district he was in, so naturally we had to coordinate a lot of items."

16

Throughout the investigation, Hall gave McLaughlin copies of his interim reports and also e-mailed McLaughlin.[4] Hall's investigation report includes several documents that suggest McLaughlin was actively involved in the investigation. For instance, McLaughlin contacted Hall about a list of contractors' names that McLaughlin had discovered on a Rolodex in Corbitt's store, and Hall entered in his notes: "District manager Leon McLaughlin notified Mike Hall, DLPM, of the situation and stated that if it developed, he would be asking for assistance." Hall stated that he already knew about this situation when McLaughlin contacted him. Hall's notes indicate that McLaughlin asked that loss prevention look into the items and report back to McLaughlin. In addition, Hall's investigation report includes several letters to McLaughlin responding to his inquiries about markdown practices in the district. Further, Hall's notes reflect that on December 2, 2005, McLaughlin attended Hall's separate investigative interviews with Corbitt and with Raya.

Hall testified that he found many violations by many employees in many Home Depot stores during his investigation, and he did not focus on Raya and Corbitt. Nevertheless, sometime in or after October, Hall began pulling documents on Corbitt

---

[4] Hall did not know for certain but assumed that Cavaluzzi got copies of his interim reports as a human resources person, either from e-mails forwarded by McLaughlin or from Hall's supervisor.

and Raya that were contained in his file. In November, he provided McLaughlin with a copy of his final report. He also sent the investigation report to the regional management level. Within a short time, Corbitt and Raya were fired.

After Hall's investigation report was sent to regional management, Lisa Keglovitz, the regional human resources director and Cavaluzzi's direct supervisor, spoke to Cavaluzzi and informed him that the terminations of Corbitt and Raya had been approved.[5] Cavaluzzi then drafted termination notices for Corbitt and Raya. He included nearly identical language in both notices concerning the grounds for termination. Raya's termination notice provided the following grounds for his firing:

> It has been brought to District and Regional Managements['] attention that Alex Raya was approving mark downs not consistent with company policy. A thorough investigation was performed; findings showed that on multiple occasions Alex approved mark downs that were not properly authorized or consistent with normal operating procedures as out lined in policy for customers/contractors, associates and competitors. Further investigation also confirmed that Alex used a Nextel phone that was company property for his own personal use. This behavior is a direct violation of Company Policy and the Code of Conduct. As a Store Manager it is expected that you model behavior that is consistent with company policy and the Code of Conduct.

Similarly, Corbitt's termination notice stated:

> It has been brought to District and Regional Managements['] attention that David Corbitt was approving mark downs not consistent with

---

[5] The person(s) responsible for making the termination decisions is a highly disputed issue that is discussed in more detail in Section III.B.1, *infra*.

18

company policy. A thorough investigation was performed; findings showed that on multiple occasions David approved mark downs that were not properly authorized or consistent with normal operating procedures as out lined in policy for customers/contractors, associates and competitors. Further investigation also confirmed that David used a Nextel phone that was company property for his own personal use. This behavior is a direct violation of Company Policy and the Code of Conduct. As a Store Manager it is expected that you model behavior that is consistent with company policy and the Code of Conduct.

These notices were signed by Cavaluzzi as the manager approving the terminations. McLaughlin signed the termination notices also as "Supervisor/Manager Conducting Counseling Session." The firings were summarily executed. Cavaluzzi flew to Pensacola on the morning of December 13, 2005, and summoned first Raya and then Corbitt into the room separately to fire each man. The termination notices were read aloud, but there was no discussion about the specific policy violations that Corbitt and Raya allegedly committed nor was there any counseling of either manager.

6. *Corbitt and Raya's Evidence in Refutation of Grounds for Termination*

The record contains evidence on behalf of both Corbitt and Raya refuting the allegations of wrongdoing which Home Depot contends were the reasons for their terminations. In response to the claim he had made an improper blanket markdown to contractors, associates, and a competitor, Corbitt provided a statement denying that there is or ever was a policy for associates, vendors, or installers to receive automatic

19

discounts, and as to customers, discounts were given on a case-by-case basis depending on the situation, such as damaged material, poor service, or poor installation. Corbitt also noted that according to the standard operating procedures of Home Depot, each manager and associate had a certain dollar authority within which to make these decisions, and he at no time violated the Home Depot policy.

Similarly, Raya stated that contractors asked for a ten percent discount, representing that Lowe's gave such a discount. Raya called Lowe's to confirm, which it did. Further, Raya called Sandy Snyder at the Foley Home Depot store and was told that Snyder gave the same discount. Therefore, Raya began to give the markdown from time to time on some sales to contractors, many with express approval of his district manager, Erik Dardas, and only if the sale would be profitable to Home Depot. Raya at first ran by Dardas every markdown of this nature being given until he learned the information Dardas felt was important for approving the markdown; then Raya asked the same questions, and if the sale was profitable, he would approve the markdown.

There are additional witness statements in the record providing that the ten percent discount to contractors had been implemented to compete with Lowe's, was a fairly common practice in the district, and had the express approval of Dardas. Dardas admitted that after receiving information from contractors that they were

receiving ten percent discounts from Lowe's, he instructed all his store managers that if this was in fact happening, he wanted them to match the offer to keep the customer.

During the course of the investigation, Raya was also questioned about the long-ago sale of a door that had been sold twice, returned, was in a damaged condition, and was sold to a Home Depot associate at a discount for $500.00. He explained that based on information McLaughlin and Hall had presented to him much later, the door was not as damaged as he had been told, and he felt that the condition of the door had been misrepresented to him by an employee at the store.

Regarding sales to Midway Lumber, a competitor of Home Depot, several witnesses stated that such sales had been approved by higher-level management and that Midway Lumber was a longtime customer of Home Depot. For instance, Calhoun testified that she had been present when Dardas gave Raya permission to make the sales to Midway Lumber and stated that she could name several more people who were witnesses to this authorization. Raya testified that over eighty percent of markdowns in price made to Midway Lumber were first approved by Dardas, and further, under Home Depot's policy, Raya had authority as store manager to approve a markdown of up to $1,000.00 on his own.[6] Additionally, Scott Gayle

---

[6] Similarly, Corbitt testified that he had authority as store manager to approve markdowns up to $1,500.00 on his own without getting the permission of his district manager.

stated that Dardas challenged Corbitt's store to get the Midway account and that Midway had been their largest commercial account "for some time."[7]

As to the claim of improper use of a company Nextel phone and improper retention of a store phone after he transferred to another store, Corbitt asserted that when he left the store, he received permission from the incoming store manager to continue using one of the three store Nextel phones for a couple of weeks so he could get the contacts on it switched over to one of his new store's Nextel phones. Further, Corbitt testified that McLaughlin knew he had his former store's Nextel phone and that McLaughlin had called Corbitt on this Nextel phone several times without any reprimand. Moreover, Corbitt offered to produce his personal cell phone bills, stating he used his personal cell phone for personal business as well as company business, and he denied using the company phone for personal calls.

With respect to Raya's use of a Home Depot Nextel phone, Raya testified that when he put together the grand opening for the new Pensacola store, people contacting him about the event had the number for his old cell phone. Therefore, Raya continued to use the phone to put together the grand opening, and he gave it

---

[7] Hall testified that another store manager, Chris Mangino, gave several markdowns to Midway Lumber, and Hall did not believe, although he did not know, that Mangino was disciplined.

back to the Daphne store right after that event was completed. Thus, he used this phone for company business.

## II. STANDARD OF REVIEW

We review *de novo* a district court's grant of summary judgment. *Chambless v. Louisiana-Pacific Corp.*, 481 F.3d 1345, 1349 (11th Cir. 2007). When deciding a motion for summary judgment, a district court must consider all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and must resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513. The grant of summary judgment should be affirmed if, after construing the evidence in the light most favorable to the non-movant, we find "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

## III. DISCUSSION

*A.    Sexual Harassment*

*1.    General Principles*

Title VII of the Civil Rights Act of 1964 states that it shall be an unlawful employment practice for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . ." 42 U.S.C. §

2000e-2(a)(1).  To establish a claim of sexual discrimination under Title VII due to hostile work environment harassment caused by a supervisor,[8] an employee must produce evidence showing:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc) (citing *Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982)).

The district court concluded that Corbitt and Raya had not demonstrated the fourth element of a hostile work environment claim; therefore, we confine our analysis to this element.

2.    *Severe or Pervasive Harassment*

Title VII is not meant to be a workplace "civility code."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 2283-84 (1998) (internal quotation marks and citation omitted).  Sexual harassment constitutes sex discrimination only

---

[8]  We assume without deciding that Cavaluzzi is a supervisor of Corbitt and Raya because the district court below considered the claim using the supervisor-as-harasser analysis, and neither party has presented this as an issue on appeal.

when the harassment "alter[s] the terms and conditions of employment. . . ." *Mendoza*, 195 F.3d at 1245. Thus, harassment constitutes employment discrimination only if "the conduct is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (internal quotation marks, brackets, and citations omitted). This "filter[s] out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher*, 524 U.S. at 788, 118 S. Ct. at 2284 (internal quotation marks and citation omitted). This determination involves both a subjective and an objective component:

> The employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. The environment must be one that a reasonable person would find hostile or abusive and that the victim subjectively perceives to be abusive. Furthermore, the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.

*Mendoza*, 195 F.2d at 1246 (citations, quotation marks, brackets, and ellipses omitted). To determine whether conduct is sufficiently severe or pervasive, we consider four factors: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 371 (1993).

Before analyzing the alleged harassment within the rubric of these four factors, the law requires that we determine which instances of harassment should be included in the analysis. We consider only "the statements and conduct . . . of a sexual or gender-related nature. . . ." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000). "Innocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or of the offended party . . . are not counted." *Id.* Here, a number of the instances the Appellants complained of were not sexual in nature. For example, Cavaluzzi telling Raya that he liked how Raya dressed, that he liked his pants, that his hair was beautiful, and that he liked his green eyes may not be appropriate workplace conversation, but it is not actionable conduct under Title VII.

Further,

> [a] man can compliment a woman's looks . . . on one or several occasions, by telling her that she is looking 'very beautiful,' or words to that effect, without fear of being found guilty of sexual harassment for having done so. Words complimenting appearance may merely state the obvious, or they may be hopelessly hyperbolic. Not uncommonly such words show a flirtatious purpose, but flirtation is not sexual harassment.

*Id.* at 584. Flirtation is part of ordinary socializing in the workplace and should not be mistaken for discriminatory conditions of employment. *Oncale v. Sundowner*

*Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S. Ct. 998, 1003 (1998). "Mere solicitude, even if repetitive, is not sexually harassing behavior." *Gupta*, 212 F.3d at 583. In the instant case, many of the comments that bothered the Appellants were merely complimentary, and some were clearly flirtatious, but this is not sexual harassment for the purposes of Title VII. Although the Appellants may be subjectively more uncomfortable because a presumably gay man made the flirtatious comments, this does not factor into the objective component of the analysis. We thus find that only one of the comments Cavaluzzi made over the phone to Raya is of a sexual nature.[9]

Likewise, some of Cavaluzzi's alleged touchings of Raya were not sexual in nature. Raya stated that Cavaluzzi put his arm around him like Cavaluzzi was his "best friend in the world"—this is not sexual in nature, and if a heterosexual man had

_____

[9] The dissent notes the importance of context in the severe or pervasive analysis—certain seemingly innocuous conduct, when viewed in context, could actually be sexually harassing conduct. We do not disagree that context is important. *See Oncale*, 523 U.S. at 81-82, 118 S. Ct. at 1003 (noting the importance of common sense and context in sexual harassment cases). The dissent would have a jury, not a court, interpret the facts that a plaintiff alleges. We do not necessarily disagree with that either. However, we have held that, as a matter of law, we may not consider mere flirtatious conduct or conduct that is not sexual in nature in the severe or pervasive analysis, even if the target is offended by the conduct. *Gupta*, 212 F.3d at 583-84 (finding that the evidence was insufficient to support a jury verdict in favor of an employee when the employee's evidence included various flirtatious and non-sex related comments and conduct). We have set up these standards so that all sexual harassment cases do *not* need to go to a jury—this would "lower the bar of Title VII to punish mere bothersome and uncomfortable conduct, and would 'trivialize true instances of sexual harassment.'" *Id.* at 586 (quoting *Mendoza*, 195 F.3d at 1252 n.10). Therefore here, viewing the record in the light most favorable to the Appellants, we include all conduct that is or arguably could be sexual in nature in the severe or pervasive analysis, and omit from the analysis only the conduct which no reasonable person would find is sexual in nature or more than mere flirtation.

done this, Raya would likely not have thought anything of it. We find that, viewing the record in the light most favorable to the Appellants, five of the touchings of Raya were sexual in nature, although they were all quite brief.

Similarly, Cavaluzzi's comments that he liked the way Corbitt dressed or that he was cute are not sexual in nature; those are simply flirtatious compliments. That Corbitt may have subjectively interpreted them as sexual does not change the analysis under the objective component.

The Appellants argue that Cavaluzzi's conduct was frequent, stating that Cavaluzzi committed between 74 and 108 sexual offenses to Corbitt and between 63 to 92 sexual offenses to Raya. They exaggerate. The record reflects far fewer instances. Moreover, given the analysis above, there were even fewer instances, as many of the comments and some of the touchings were not sexual in nature. Our review of the record shows that there were five touchings and one comment that were actually sexual in nature toward Raya—Cavaluzzi putting his hand on Raya's thigh; Cavaluzzi pressing his body against Raya such that Cavaluzzi's body was touching Raya's "privates;" three instances of massage of the neck and shoulders; and Cavaluzzi's comment that Raya was "the Italian heifer that I like."[10] There were four

_____

[10] We do not hold that these instances are sexual in nature as a matter of law. Rather, viewing the record in the light most favorable to the Appellants, we conclude that a fact-finder could
(continued...)

28

touchings and four comments that were actually sexual in nature toward Corbitt—Cavaluzzi's rubbing of Corbitt's shoulder with one hand and Corbitt's stomach with the other; Cavaluzzi's rubbing of Corbitt's back, neck, head, and shoulders at the November meeting; two more instances of massage of the neck and shoulders; Cavaluzzi's comment that he could show Corbitt how and he would "like it;" Cavaluzzi's question if Corbitt "wore boxers or briefs or nothing;" Cavaluzzi's comment about Corbitt's "natural color down there"; and Cavaluzzi's recommendations of various gay websites so Corbitt "could see what [Cavaluzzi] is talking about."[11] The frequency of harassment is analogous to the frequency in *Gupta*, in which there were four touchings and frequent sexual comments, which was not sufficiently frequent. 212 F.3d at 578.

Even to the extent that Cavaluzzi's conduct was frequent, this "does not compensate for the absence of other factors." *Mendoza*, 195 F.3d at 1248. The Appellants argue that Cavaluzzi's harassment was severe. We disagree. The Appellants claim that the touchings were "substantial," but both Corbitt and Raya admitted that most of the touchings were quite brief. In *Gupta*, touchings that

[10] (...continued)
find that these instances are sexual in nature.

[11] We do not hold that these instances are sexual in nature as a matter of law. Rather, viewing the record in the light most favorable to the Appellants, we conclude that a fact-finder could find that these instances are sexual in nature.

included briefly putting a hand on the plaintiff's inner thigh and lifting the hem of the plaintiff's dress four inches were not sufficiently severe. *Id*. This conduct is no less severe than Cavaluzzi's massage and hugs, some of which were not even sexual in nature. The most severe instance was perhaps when Cavaluzzi briefly put his hand on Raya's leg, but this is analogous to the conduct in *Gupta* that was not sufficiently severe. The Appellants seem to suggest that the fact that the touchings were same-sex makes them somehow more severe. This is not the law.

The Appellants also argue that Cavaluzzi's comments were "sexual and severe." We disagree. Many of the comments, particularly those made to Raya, were not sex-based. Some of Cavaluzzi's comments to Corbitt, on the other hand, were relatively severe (e.g. "I know you're not gay, but you've probably thought about it, I could show you how, I know you'll like it"). The Appellants claim that they were more severe than the conduct in *Gupta* or *Mendoza*, conduct we found was not sufficiently severe. This is arguable. The conduct in *Mendoza* included an instance of a coworker looking at the plaintiff's groin area and sniffing, which is probably more severe and certainly more humiliating than Cavaluzzi's comments. While some may find Cavaluzzi's comments somewhat more severe, this does not save the Appellants under the severe or pervasive element. No one factor is dispositive, unless the conduct is very extreme. Instead, we examine conduct in context, not as isolated

30

acts, and determine under the totality of the circumstances whether the harassing conduct was sufficiently severe or pervasive. *Mendoza*, 195 at 1245. The fact that only several of the comments were sexual in nature and happened during brief phone calls leads us to agree with the district court that the conduct was not sufficiently severe or pervasive.

Because we find that Cavaluzzi's alleged harassment was not sufficiently severe or pervasive to support a hostile work environment claim, we need not consider whether Home Depot established the affirmative defense set forth by the Supreme Court in *Faragher*, 524 U.S. at 807, 118 S. Ct. at 2292-93 and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S. Ct. 2257, 2270 (1998).

B.    *Retaliation*

The anti-retaliation provision of Title VII prohibits discrimination against an employee for engaging in activity deemed protected under the statute. 42 U.S.C. § 2000e-3(a). A claim brought under this provision based on circumstantial evidence is analyzed using the *McDonnell Douglas*[12] burden-shifting model. *See Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993) (citing *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989)). To make a *prima facie* case of

---

[12] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 1824-26 (1973).

retaliation under Title VII, a plaintiff must show that: (1) he engaged in an activity protected under Title VII; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). Once a plaintiff establishes a *prima facie* case, the burden of production shifts to the employer who must proffer a legitimate, non-retaliatory reason for the adverse employment action. *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008). If the employer offers such a legitimate reason for the employment action, the plaintiff must then demonstrate that the employer's proffered explanation is a pretext for retaliation. *Id.*

### 1.    *Prima Facie Case*

The parties do not dispute the existence of the first and second elements of Corbitt and Raya's *prima facie* case. The disagreement concerns the third element: whether there was a causal connection between the protected activity and the adverse employment action.

> In order to establish the requisite "causal link" required as part of a prima facie case, a plaintiff need only establish that the protected activity and the adverse action were not wholly unrelated. At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action. The defendant's awareness of the protected statement, however, may be established by circumstantial evidence.

32

*Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993) (internal quotation marks and citations omitted). In the case of a corporate employer, "the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression and acted within the scope of his or her agency when taking the action." *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997).

When a corporate employer denies that a particular employee had the authority to make a termination decision, such denial puts the scope of that employee's agency in question and "impose[s] on [the plaintiff] the burden of establishing that [the employee's] authority extended to making personnel decisions regarding [the plaintiff]." *Id.* at 1198. The sole fact that a particular employee informs a plaintiff of his or her termination does not raise a genuine issue of material fact that such employee is the decision maker. *Id.* An employee who functions as "a facilitator or conduit only" is not a true decision maker. *Id.* Even if an employee reviews and evaluates termination decisions, but does not have the authority to overrule such decisions, that employee is not the decision maker. *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1356 (11th Cir. 1999).

The actual awareness requirement "rests upon common sense." *Brungart v. Bellsouth Telecommc'ns, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).[13] "A decisionmaker cannot have been motivated to retaliate by something unknown to him." *Id.* Because Title VII retaliation requires actual knowledge on the part of the decision maker, the knowledge of one who is not a decisionmaker cannot be imputed to the decisionmaker. *Id.* at 800.

Courts are wary of relying on weak circumstantial evidence to imply a decisionmaker's knowledge of protected expression. For instance, in *Brungart* we found that "temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." *Id.* at 799. Additionally, "while we have held that awareness of protected expression may be established based on circumstantial evidence, our cases have required plaintiffs to show a defendant's awareness with more evidence than mere curious timing coupled with speculative theories." *Raney*, 120 F.3d at 1197. Thus, a mere "hunch" that an employee with knowledge of protected expression informed a decisionmaker of the

---

[13] Although *Brungart* was a retaliatory discharge case brought under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601-54 (1994), we indicated that our analysis would be the same under either the FMLA or Title VII. *Brungart*, 231 F.3d at 798.

34

protected expression does not constitute "significant probative evidence" to avoid summary judgment. *Id.* at 1198.

However, evidence that a biased employee with retaliatory motives influenced or participated in the decision to terminate an employee raises a genuine issue of material fact whether there is a causal connection between the employee's protected conduct and his termination. *See, e.g.*, *Pennington*, 261 F.3d at 1270, 1270 n.5 (explaining that a causal connection may exist "when the ultimate decisionmaker never would have made the decision in the absence of the actions of the biased employee, or was influenced by that bias"); *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1461 (11th Cir. 1998) (upholding a jury verdict against an employer where there was circumstantial evidence that "the decision to terminate [the plaintiff] was at least influenced by individuals . . . who unequivocally had knowledge of [the protected activity]"); *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) ("In summary, we hold that to establish the essential element of causation in a subordinate bias case—where the investigation that led to the adverse employment decision was initiated by, and would not have happened but for, the biased subordinate—the plaintiff must show that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or the investigation leading thereto."). Furthermore, the position of

a biased employee within the company may raise an inference that he influenced the termination decision:

> Given the nature of [retaliatory employee] Raymond's position as a human resources specialist and his professional relationship with [decisionmaker] Sharon Powell (who often consulted with him on various personnel-related issues), a jury could reasonably conclude that she and [decisionmaker] Phil Tatum relied on his recommendation in deciding to terminate Wright. If so, Raymond's retaliatory intent could be considered the cause of Wright's termination, despite the fact that Raymond was not one of the people who actually made the decision to discharge Wright.

*Wright v. Southland Corp.*, 187 F.3d 1287, 1306 n.26 (11th Cir. 1999).

In the instant case, Corbitt and Raya assert that they have proven the causal connection between their complaints of harassment and their terminations by introducing evidence of three facts: (1) "the group decision [was] tainted with the knowledge of Cavaluzzi and possibl[y] McLaughlin"; (2) "Cavaluzzi's own laughing, bragging, boast that he got them fired"; and (3) "the notice to a delineated appropriate representative."

Regarding the first two facts, Corbitt and Raya contend that Cavaluzzi and McLaughlin were decisionmakers who were motivated by retaliation. Cavaluzzi had retaliatory motives because their complaints of sexual harassment were against him, and McLaughlin had retaliatory motives because he was a "business partner" of Cavaluzzi who had knowledge of Cavaluzzi's sexual harassment and could be facing

36

termination for failing to act on Corbitt's and Raya's complaints.[14]  Significantly, Corbitt and Raya note that they were terminated twenty-five days after they made formal complaints of Cavaluzzi's harassment to McLaughlin and Home Depot's Aware Line through Calhoun.

As to the first highlighted fact, to demonstrate that Cavaluzzi caused their terminations by participating in the group decision, Corbitt and Raya point to Cavaluzzi's deposition testimony in which Cavaluzzi admitted that he approved Corbitt's and Raya's termination notices and participated in their termination counseling sessions.  He also testified that the terminations were group decisions, and he agreed that he was a part of the termination group.  However, when questioned further about the meaning of his signature on the termination notices, Cavaluzzi gave the following testimony:

Q:    Well, you wrote the reason for the termination, correct?

A:    Again, I will tell you one more time.  I did not even–this was written–give a rough draft, okay, even on a ten-year associate, I can't even have this delivered without approval.  So this was wordsmithed by another person.

Q:    You didn't write this?

_____

[14]  McLaughlin stated in his sworn declaration that he was unaware of Corbitt's and Raya's complaints of harassment until well after their terminations.  McLaughlin's declaration is in direct conflict with the sworn testimony of Calhoun, Corbitt, and Raya, each of whom testified about telling McLaughlin directly of Cavaluzzi's sexual harassment of Corbitt and Raya on several occasions in the fall of 2005 before these store managers were terminated.

A:     I wrote it and it was wordsmithed and send back to me.

Q:     Then you read it and you approved it, the language?

A:     I read it and we went for termination.

Q:     Surely you're not telling me you just rubber-stamped it?

A:     I'm not what?

Q:     Surely you're not saying, I just rubber-stamped this piece of paper?

A:     I don't know what you mean by that.

Q:     I just wrote my name on it without looking at it or–

A:     No.  Of course, I read it.  It would be ridiculous to say I haven't read it.

In response to additional questioning, Cavaluzzi stated, "Again, I did not make the decision to fire them."

Home Depot argues that this testimony, when viewed in context, shows that Cavaluzzi was not actually a decisionmaker but instead was merely a conduit through which Home Depot provided Corbitt and Raya with their termination notices.  Home Depot states that the recommendation to terminate Corbitt and Raya was made by Keglovitz, the regional human resources director, and Powers, the regional vice president, based upon an investigation independently initiated and conducted by Hall.  The termination recommendations were then reviewed and approved by Taylor, the

divisional employment practices director, and Goldsmith, the human resources vice president. Curiously, while Keglovitz and Powers state that they "recommended" termination, and Taylor and Goldsmith state that they "approved" termination, no Home Depot management employee expressly states that he or she was responsible for making the actual termination decision.

The sworn declarations of Keglovitz, Powers, Taylor, and Goldsmith include nearly identical paragraphs in which they state that they were not aware that either Corbitt or Raya complained of sexual harassment against Cavaluzzi when the termination recommendations or approvals were made, and that they did not learn of the allegations of sexual harassment until well after Corbitt and Raya were terminated. While Keglovitz testified that she communicated with Cavaluzzi about the terminations, apparently at no time did Cavaluzzi, a regional manager, tell his supervisor, Keglovitz, that he was the subject of sexual harassment complaints by both Corbitt and Raya. In addition, Cavaluzzi testified that he was in communication with Keglovitz about the investigation of Corbitt and Raya before the terminations.[15] Similarly, McLaughlin failed to tell his supervisor, Powers, at any time before Corbitt and Raya were terminated that both store managers had made complaints against

---

[15] Cavaluzzi testified "I did not really talk with Mike Hall. I talked more with my boss, Lisa [Keglovitz], about the investigation."

Cavaluzzi, and further that McLaughlin, knowing of such complaints, had taken no action to stop the harassment.

Nevertheless, Corbitt and Raya have provided evidence that Cavaluzzi and McLaughlin participated in the Hall investigation and influenced the termination decision purportedly made by Keglovitz, Powers, Taylor, and Goldsmith. As to Cavaluzzi's involvement, Corbitt and Raya point to their second highlighted fact: Calhoun testified that Cavaluzzi called her and bragged that he was responsible for Corbitt and Raya's terminations. Cavaluzzi's own admission that he orchestrated the terminations of Corbitt and Raya, in addition to his testimony that he participated in the group termination decision, raises a factual issue whether he caused Corbitt's and Raya's terminations in retaliation for their complaints of harassment.

Moreover, Raya gave testimony during his deposition about threats Cavaluzzi made. He testified that Cavaluzzi's statements and actions indicated that he was "out to get" Raya. Raya's store human resources manager, Susan Parker, purportedly told Raya that Cavaluzzi had said that he was "going to get" Raya, Raya's "days were numbered," and Raya was "not out of the woods." Further, Cavaluzzi informed Raya that he was involved in the investigation that resulted in Raya's termination.

In a previous case, we found that similar evidence raised a genuine issue of material fact concerning whether a retaliatory employee caused a termination, thus

40

establishing the requisite causal connection between the employee's protected conduct and his termination:

> The threat of "You will regret it," made by a human resources director, hardly could be anything other than a threat of some form of employment-related hardship. Furthermore, the threat was clearly linked to the statutorily-protected activity of pursuing a complaint with the EEOC. Finally, [the employee] was terminated—based in part on [the human resources director's] recommendation—one month thereafter. Thus, [the employee's] testimony, if believed, is sufficient to make out a case of retaliation.

*Wright*, 187 F.3d at 1306 (footnote omitted).[16] Also, Cavaluzzi stated in his deposition that he was "business partners" with all the district managers in his region. One such district manager was McLaughlin. Cavaluzzi explained that it was his job "to influence" the district managers regarding personnel decisions. A jury could reasonably infer from this evidence that, given his retaliatory motives, boasts, and threats, Cavaluzzi influenced Hall's investigation of Corbitt and Raya through McLaughlin and thus participated in the group decision to terminate them. *See Wright*, 187 F.3d at 1306 n.26 (inferring a retaliatory employee's influence in the termination decision from the professional relationship between the decisionmakers and the retaliatory employee).

---

[16] In *Wright*, we found these threats to be direct evidence of retaliation. *Wright*, 187 F.3d at 1305-06.

41

Because Cavaluzzi's statements contradict Home Depot's evidence that Cavaluzzi was not involved in the group termination decisions, and because Corbitt and Raya have produced evidence that suggests Cavaluzzi took part in the termination decisions, there is a genuine factual issue whether Cavaluzzi caused the terminations.

Similarly, the record demonstrates that McLaughlin was an active participant in the Hall investigation that led to the terminations. A number of documents in Hall's investigation report were employee responses to questions from McLaughlin. Furthermore, McLaughlin directed Hall at least once specifically to investigate Corbitt's markdown practices.[17] Additionally, on December 2, 2005, McLaughlin attended Hall's separate investigative interviews with Corbitt and with Raya. Moreover, Corbitt testified that McLaughlin interviewed the employees in his store about Corbitt's performance, the times he arrived and left work, and instructed the employees not to tell Corbitt anything about his questioning.

Both Corbitt and Raya testified that they complained directly to McLaughlin about Cavaluzzi's behavior in the fall of 2005. After Parker told Raya about the threats Cavaluzzi had made against him, Raya in turn told McLaughlin about Cavaluzzi's sexual harassment and threats. Raya asked McLaughlin "to partner with"

---

[17] This testimony is in conflict with paragraph 15 of Hall's affidavit in which he states under oath "Home Depot's District manager, Leon McLaughlin, did not attempt to influence or direct me to investigate any particular subject matter or individual."

him to confront Cavaluzzi about these threats. Instead, McLaughlin chastised Parker for telling Raya of Cavaluzzi's threats and told Raya not to call Cavaluzzi. One could reasonably infer from this evidence that McLaughlin was aware of Cavaluzzi's retaliatory motives and was trying to hide this information from Corbitt and Raya. McLaughlin also could have been concerned for his own job due to his failure to act on the complaints of harassment in violation of Home Depot's policy.

As their third highlighted fact, Corbitt and Raya emphasize that they reported the harassment to a delineated Home Depot representative, Calhoun, to establish Home Depot's knowledge of the harassment prior to their terminations. In the case of a retaliation claim against a corporate defendant, however, knowledge of someone within the corporation may not be imputed to the decisionmaker. *Brungart*, 231 F.3d at 799-800. For a corporate defendant to be held liable for a retaliatory discharge, the corporate agent making the discharge decision must either have actual knowledge of the protected conduct or be influenced by someone with knowledge. Thus, Calhoun's knowledge does not establish notice to Home Depot of Corbitt's and Raya's complaints of harassment.

Nevertheless, the record presents sufficient circumstantial evidence to raise genuine issues of material fact concerning Cavaluzzi's and McLaughlin's involvement in the decisions to terminate Corbitt and Raya. We have previously

43

explained that a corporate employer is not insulated from the actions of a retaliatory subordinate who manipulates the decisionmakers into terminating an employee. *See, e.g.*, *Pennington*, 261 F.3d at 1270, 1270 n.5 (explaining that a causal connection may exist where the termination decision is "tainted" by the retaliatory animus of a subordinate employee); *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) (per curiam) ("causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee"); *Wright*, 187 F.3d at 1304 n.20 (stating that the discriminatory intent of a subordinate may be deemed the cause of an employee's termination if that biased subordinate "manipulated the decisionmakers . . . into terminating" the employee). In this case, the retaliatory employee, Cavaluzzi, was a human resources employee and a member of upper management. His business partner, McLaughlin, was also a member of upper management. A jury could reasonably infer from the evidence that these high-level managers influenced the Hall investigation. Additionally, because it is undisputed that the purported decisionmakers, Keglovitz, Powers, Taylor, and Goldsmith, did not make an independent investigation of the policy violations allegedly committed by Corbitt and Raya, a jury could reasonably infer that Cavaluzzi and McLaughlin caused the terminations of Corbitt and Raya.

## 2. *Legitimate, Non-Retaliatory Reason*

Once a plaintiff has established a *prima facie* case of retaliation, "'the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action.'" *Raney*, 120 F.3d at 1196 (quoting *Hairston*, 9 F.3d at 919). It is undisputed that Home Depot has done so by stating that Corbitt and Raya were terminated for violating Home Depot's standard operating procedures and code of conduct. Specifically, the termination notices for both Corbitt and Raya, drafted by Cavaluzzi using nearly identical language, stated that these managers were "approving mark downs not consistent with company policy." They continued to state that these "mark downs . . . were not properly authorized or consistent with normal operating procedures." Additionally, "further investigation" confirmed that Corbitt and Raya "used . . . Nextel phone[s] that [were] company property for [their] own personal use." Because Home Depot has produced legitimate, non-retaliatory reasons for Corbitt's and Raya's terminations, we must consider whether Corbitt and Raya have demonstrated that these reasons are instead pretext for retaliation.

## 3. *Pretext*

A plaintiff raises a genuine issue of material fact concerning pretext if the plaintiff casts sufficient doubt on the defendant's proffered non-retaliatory reasons

45

to permit a reasonable fact finder to conclude that the employer's proffered reasons were not what actually motivated its conduct but were pretext for retaliation. *Crawford*, 529 F.3d at 976; *Combs v. Plantation Patterns, Meadowcraft, Inc.*, 106 F.3d 1519, 1538 (11th Cir. 1997). A plaintiff may show pretext "'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095 (1981)). "'A plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable.'" *Id.* (brackets omitted) (quoting *Howard v. BP Oil Co.* 32 F.3d 520, 526 (11th Cir. 1994)). In reviewing a summary judgment motion, "'the district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Id.* (quoting *Combs*, 106 F.3d at 1538).

The district court summarized the bulk of the evidence of pretext provided by Corbitt and Raya as follows:

46

[Appellants] attempt to show pretext by offering comparators who allegedly committed the same or similar mark down violations without being terminated. [Appellants] submit that 1) Store Manager, Tim Pardue, gave blanket ten percent discounts to contractors at the Foley Store; 2) Store Manager, Sandy Snyder, continued Pardue's practice of giving 10 percent discounts to contractors at the Foley store; 3) Assistant Store Manager, Dan Shulte, allowed the blanket discounts to contractors at the Foley store; 4) Store Manager, Donna Montgomery, replaced Corbitt at the Foley store and continued the blanket 10 percent discounts to contractors; 5) District Manager, Eri[k] Dardas, approved blanket ten per cent discounts to contractors at the Foley store and approved discounted sales to competitor, Midway Forest Products;[18] 6) Either Aaron Flow or Chris Mangino and either Sabrina Jones or Dan Shulte were the store managers of the Pensacola Store and allowed discounts to Adams Homes; 6) Store Manager, Rick Liska, gave blanket 10 percent discounts to contractors on all sales over $1,000 if made on Home Depot charge cards and us[ing] a Home Depot cell phone, 7) District Manager, Leon McLaughlin, approved or allowed Liska to give 10 percent discounts to contractors and approved sales to a competitor, Midway Forest Products, 8) Store Manager, Aaron Flow, sold discounted truckloads of OSB sheets to competitor, Midway Forest Products, 9) Store Manager, Mike McGowan, approved sales to a competitor, Midway Forest Products, 10) Store Manager, Chris Mangino, marked down sales to a competitor, Midway Forest Products, and 11) Vicki Hall used a Home Depot cell phone.

We have explained the degree to which a comparator employee must be similarly situated: "The plaintiff and the employee she identifies as a comparator must be similarly situated 'in all relevant respects.' The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision

---

[18] Rather than serve as comparator evidence, this fact tends to challenge the veracity of Home Depot's claim that Corbitt's and Raya's markdowns and sales to a competitor were unauthorized.

47

by the employer." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (citation omitted). Citing this language, the district court found that Corbitt and Raya's comparator evidence did not establish pretext because the proffered comparators did not have the exact same positions as Corbitt and Raya and did not engage in the exact same policy violations.

In analyzing this evidence solely as comparator evidence, however, the district court failed to examine whether the evidence also offered support for Corbitt and Raya's arguments that they did not in fact violate Home Depot's policies and/or that their actions were authorized by their district manager, Dardas, or were within their discretion as store managers. In this regard, the district court did not fully consider the arguments made by Corbitt and Raya concerning the illegitimacy of the reasons given by Home Depot for their terminations. Instead, the court simply stated that it "does not find the reasons offered by Home Depot to be inconsistent." The court continued:

> The court also finds unavailing [Appellants'] contention that pretext is provided by Home Depot's failure to produce more evidence regarding when the investigation started or to have kept a better record of the investigation. [Appellants] have submitted no reliable evidence that the investigation was a sham or that it was only begun because [Appellants] complained about Cavaluzzi's conduct.

48

There is circumstantial evidence supporting Corbitt and Raya's assertion that they were not fired for the reasons proffered by Home Depot. Home Depot contends that Corbitt and Raya were terminated in part because they gave unauthorized ten percent discounts to contractors, associates, family members, and a competitor in violation of its markdown policy. In response, Corbitt and Raya have produced evidence showing that these markdowns were in fact made pursuant to Home Depot's policies. They have offered their statements that Dardas approved the contractor discounts and the sales to Midway Lumber. Dardas himself admitted to approving a matching Lowe's ten percent discount, a new commercial credit card account ten percent discount, and quarterly contractor discounts. Although Dardas directly denies approving certain markdowns, there is a factual issue whether these markdowns in fact occurred and whether they were authorized by Dardas.

Other employees also confirmed approval by Dardas of the general ten percent contractor discount.[19] For instance, there is evidence from statements of employees such as Todd Saddler and Sam Power that other store managers within the district, such as Sandy Snyder and Rick Liska, gave regular ten percent discounts to contractors. Polo Cutts stated that Dardas had challenged stores in the district to meet

---

[19] Corbitt noted during his deposition testimony that after he and Raya were fired, few managers would admit that they had approved markdowns.

49

and beat competition with discounts that protected the bottom line. Taylor Morgan, Dan Schulte, John Vaughan, Scott Gayle, and Rick Liska provided statements that Dardas had encouraged contractor discounts in the district to compete with Lowe's.

As to the sales to a competitor, Midway Lumber, Calhoun testified that she in fact witnessed Dardas' approval of the Midway Lumber sales to Raya. This approval was also confirmed by Scott Gayle. Thus, Corbitt and Raya have provided considerable evidence that, when construed in the light most favorable to them, raises a genuine issue of material fact whether they violated Home Depot's markdown and competitor sales policies.

Moreover, there is question from the record whether Home Depot even had a policy prohibiting the actions for which Corbitt and Raya were purportedly terminated. For instance, Keglovitz admitted there is no Home Depot policy against giving a competitor a discount.

Hall stated that Home Depot had a "meet and beat" policy such that if a customer showed that a competitor had a lower price, Home Depot would beat that price on identical in-stock merchandise by ten percent and meet that price on all special order merchandise, installations, or other special order products, except lumber. Further, if a markdown sale by a store manager was approved by the district

manager, any violation of a Home Depot policy would be attributed to the district manager who approved it and not to the store manager.

Notably, a written copy of Home Depot's markdown policy was not included in the record on appeal. Additionally, Corbitt's and Raya's termination notices indicate that any policy violations should be specifically identified, but in the spaces designated for such specifications, the notices state generally "Violation of Company Policy." Construing all of this evidence in the light most favorable to Corbitt and Raya, a jury could reasonably infer that the supposedly unauthorized markdowns were not what truly motivated Home Depot to terminate Corbitt and Raya.

Home Depot offered as an additional legitimate, non-retaliatory reason that Corbitt and Raya had used the company Nextel phones improperly by retaining phones from stores which they had left and by using these phones for personal business. However, Corbitt and Raya have both provided statements explaining that the continued use of the Nextel phones from their previous stores was authorized by the incoming store managers and was done for legitimate business reasons. They also both denied using the company phones for personal business. In contrast, Home Depot has not explained which specific policy Corbitt and Raya violated in using the Nextel phones, nor has it provided evidence that such use was a terminable offense. In any event, a reasonable jury could find that such a minor policy violation would

51

not realistically motivate an employer to terminate two store managers with over ten years of service.

The source of Home Depot's legitimate, non-retaliatory reasons is the Hall investigation. Significantly, the Hall investigation itself is riddled with inconsistencies and contradictions which raise significant doubts about its legitimacy. First, Corbitt and Raya note that while Home Depot contends that Hall began his investigation into impermissible markdowns in late spring of 2005, the earliest-dated document in his investigation notes is dated September 28, 2005. In addition, several documents within Hall's investigation report, upon which the decisionmakers purportedly relied to make the termination decisions, are dated *after* Corbitt's and Raya's terminations on December 13, 2005. In her deposition, Keglovitz specifically pointed to these documents, some of which bore the post-termination dates, as what she reviewed in reaching her decision to recommend termination. Also, Hall's notes are far more detailed regarding alleged policy violations by Corbitt and Raya than any other employee, even though the investigation was supposedly district-wide. Despite the fact that Hall allegedly never particularly focused his investigation on Corbitt and Raya, these were the only two employees terminated.

The legitimacy of the investigation is further rendered questionable by the fact that there is no record of the formal complaint lodged by Calhoun on behalf of Corbitt

and Raya in Home Depot's files; Corbitt and Raya were terminated on the exact same day with almost identical notices listing exactly the same reasons for termination; no specific policy violations were listed on the notices even when the forms stated that such violations should be specified; Cavaluzzi and McLaughlin signed and delivered these notices to Corbitt and Raya; and the record of the complaints and actions taken by Calhoun as to Cavaluzzi's sexual harassment, which she maintained at the Home Depot store, have never been produced. Further there is confusion and inconsistency in the testimony of Keglovitz and Hall as to what the Home Depot policy is and whether it was in fact violated by Corbitt and Raya. Corbitt and Raya's contention that Cavaluzzi and McLaughlin used the Hall investigation as a vehicle to effect their terminations is supported by the lack of any indication in the record that Keglovitz, Powers, Taylor, or Goldsmith, the corporate officers who approved the recommendation to terminate Corbitt and Raya, conducted any independent investigation of the matter. Instead, the decision was made based on input from a small group of managers, which included among their number the accused perpetrator of the sexual harassment, Cavaluzzi, one of his business partners in the region who had refused to take, and had blocked, any action to stop the inappropriate behavior, McLaughlin, and the Hall report in the formulation of which McLaughlin had been a participant. The district court found that Corbitt and Raya had not submitted any

53

evidence to demonstrate that this investigation was a sham; however, a jury could reasonably infer from the evidence that Corbitt and Raya were being improperly targeted for investigation and termination by Cavaluzzi and McLaughlin.

Based on this evidence, there is a genuine issue whether Home Depot's proffered reasons for terminating Corbitt and Raya were pretext for retaliation. In granting summary judgment for Home Depot, the district court appears not to have drawn all reasonable inferences in the light most favorable to Corbitt and Raya and instead improperly weighed the evidence. Therefore, we must reverse the grant of summary judgment to Home Depot on Corbitt and Raya's claim of retaliation.

## C.    *State Law Claims*

Count Three of the Appellants' Complaint alleges four state law claims against Home Depot in a single count: assault and battery; outrage; negligent and wanton hiring, retaining, training and supervision; and invasion of privacy. Count Three reads as follows:

**Count Three**
(State Law Claims)
------------------------------------------
53. [Appellants] adopt and incorporate the allegations set forth in this Complaint.

54. Assault and Battery: The conduct of Home Depot's agent, Cavaluzzi, constituted assaults and batteries against the [Appellants] and invasions of the [Appellants'] privacy.

54

55. The assaults and batteries of Cavaluzzi were conducted in rudeness and in a hostile manner. Home Depot condoned or ratified such assaults and batteries.

56. Outrage: The Defendant recklessly and/or intentionally caused the [Appellants] to suffer severe emotional distress through the Defendant's extreme and outrageous conduct.

57. Negligent and Wanton Hiring, Retaining, Training and Supervision: Defendant Home Depot negligently and wantonly hired, retained, trained, and supervised Cavaluzzi thereby causing the [Appellants] to suffer severe emotional distress.

58. Invasion of Privacy: The conduct of Home Depot's agent, Cavaluzzi, constituted a wrongful intrusion and invasion of the [Appellants'] privacy. Cavaluzzi's wrongful acts were committed in the line and scope of the [sic] his employment with Home Depot; or Cavaluzzi's wrongful acts were committed in furtherance of the business of the Home Depot; or Home Depot participated in, authorized, or ratified such wrongful acts.

59. As a proximate consequence of the aforedescribed conduct of Defendant, [Appellants] have incurred great mental and emotional distress and have lost earnings from their employment. [Appellants] claim punitive damages.

(R.1 at 14-15.) Thus, paragraph 53 of Count Three incorporates all allegations in the Complaint, including those relevant only to Count One, a federal harassment and hostile work environment claim, and Count Two, a federal retaliation claim.

The Complaint is a classic example of shotgun pleading. First, it alleges all state law claims in a single count. *See Cesnik v. Edgewood Baptist Church*, 88 F.3d 902, 905 (11th Cir. 1996) (lamenting that a Complaint was "framed in complete disregard of the principle that separate, discrete causes of action should be plead in separate counts") (citation omitted); *Anderson v. Dist. Bd. of Trs.*, 77 F.3d 364, 366-

67 (11th Cir. 1996) (finding that failure to "present each claim for relief in a separate count, as required by Rule 10(b)," constitutes shotgun pleading and undermines the ability of a court to administer justice).

Second, each count incorporates by reference all allegations of the previous counts. As a consequence, it is impossible to determine the factual basis for each claim. We have roundly condemned this type of pleading. *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir. 2002) ("The typical shotgun complaint contains several counts, each one incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts . . . contain irrelevant factual allegations and legal conclusions.").

Finally, pleading multiple assaults and batteries as one claim violates Federal Rules of Civil Procedure 10(b)'s clear command that, "each claim founded on a separate transaction or occurrence . . . must be stated in a separate claim or defense."

The district court granted summary judgment on the Appellants' claims of assault and battery, invasion of privacy, and outrage on the basis that the Appellants had not shown that Home Depot could be vicariously liable for the conduct of

Cavaluzzi.[20] Under Alabama law,[21] an employer can be held vicariously liable for the intentional torts of its employee if it ratifies its employee's torts. *Machen v. Childersburg Bancorporation, Inc.*, 761 So. 2d 981, 984-85 (Ala. 1999). To show that an employer ratified its employee's torts, a plaintiff must show, among other things, that the employer "had actual knowledge of the tortious conduct of the offending employee. . . ." *Id.* (*quoting Potts v. BE & K Constr. Co.*, 604 So. 2d 398, 400 (Ala. 1992)). The district court concluded that Home Depot did not have "actual knowledge" of the tortious conduct of Cavaluzzi until November of 2005, and that at that point it took adequate steps to remedy the situation. Accordingly, the district court concluded that summary judgment was appropriate for the assault and battery, invasion of privacy, and outrage claims because Home Depot was not vicariously liable for Cavaluzzi's conduct under Alabama law. The district court additionally held that summary judgment was appropriate on the invasion of privacy and outrage

---

[20] The parties settled the negligent hiring, retention, training, and supervision claim; it is not before us on this appeal.

[21] Only Appellants' Alabama tort law claims are before us. Although the Appellants included claims under the Florida Civil Rights Act in the Second Amended Pretrial Order (R.135 at 21-22), the district court granted summary judgment on those claims (R.141 at 34 n.6), and the Appellants do not challenge this ruling on appeal. Therefore, we consider any argument that summary judgment on the Florida Civil Rights Act claims was in error abandoned, and focus solely on the claims of assault and battery, invasion of privacy, and outrage claims alleged under Alabama law. *See Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 n.4 (11th Cir. 2008) (argument abandoned if not presented in brief on appeal).

claims because the conduct alleged was not severe enough to constitute either invasion of privacy or outrage under Alabama law.

The Appellants make only two arguments on appeal in support of their contention that summary judgment on its Alabama tort claims was inappropriate. First, the Appellants argue that Home Depot had actual knowledge of the tortious conduct when Raya and Corbitt told Calhoun of Cavaluzzi's conduct in April and June of 2005, respectively. The Appellants argue that, because Home Depot had actual knowledge of Cavaluzzi's tortious conduct, it ratified the torts under Alabama law, and summary judgment was inappropriate for the assault and battery, invasion of privacy, and outrage claims. Second, Appellants argue that the tortious conduct at issue was severe enough to constitute an invasion of privacy and outrage under Alabama law.[22]

We affirm the district court's grant of summary judgment on the assault and battery claims because there is no record evidence to support the only argument that Appellants make on appeal. We affirm the district court's grant of summary judgment on the invasion of privacy claim because we are not able to discern the factual basis for the invasion of privacy claim. Thus, the Complaint fails to state a

---

[22] We consider any other argument that the district court erred in granting summary judgment on the Alabama tort claims abandoned. *See Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 n.4 (11th Cir. 2008) (argument abandoned if not presented in brief on appeal).

claim. And we affirm the grant of summary judgment on the outrage claim because there is no record evidence of one element of the claim. We have no occasion to decide whether shotgun pleading is in and of itself an appropriate basis for affirming the grant of summary judgment on any of the claims. By the same token, we have no occasion to decide whether *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) (en banc) abrogates the remand-for-repleading remedy for shotgun pleading that we applied in *Magluta v. Samples*, 256 F.3d 1282, 1284-85 (11th Cir. 2001).

We consider in turn each of the three state law claims before us.

*1. Assaults and Batteries*

First, we seek to determine what tortious conduct underlies the assault and battery claims. Second, we determine whether there is record evidence that Home Depot had "actual knowledge" of Cavaluzzi's tortious conduct, as the Appellants contend, from the Appellants' discussions with Calhoun in April and June of 2005. The only argument Appellants make on appeal that Home Depot had "actual knowledge" of the assaults and batteries is that there is record evidence that Appellants told Calhoun about them in April and June of 2005. (Appellant's Br. at 28.) We limit our review to the merits of this one argument. *See Sepulveda v. U.S.*

59

*Att'y Gen.*, 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) ("When an appellant fails to offer argument on an issue, that issue is abandoned.") (citations omitted).

The Complaint indicates that the Appellants claim more than one assault and battery because Count Three speaks of assaults and batteries in the plural. But, there is no indication in the Complaint of how many or when they occurred. We turn to the Second Amended Pretrial Order for clarification. There we find only the following as the factual basis for the assault and battery claims: "All admissible facts relevant to whether Mr. Cavaluzzi touched the [Appellants] or their clothes in rudeness, in anger, or in a hostile manner." (R.135 at 26.) In the Appellants' Opposition to Summary Judgment in the district court, however, the Appellants asserted three assault and battery claims under Alabama law.[23] (R.92 at 60.) First, Cavaluzzi massaged Corbitt's belly at the Mobile Montlimar store in August of 2005. (*Id.* at 6, 60.) Second, Cavaluzzi massaged Raya's leg at the Daphne store in March of 2005. (*Id.* at 7, 60.) And third, he massaged Raya's neck and shoulder at the Lake Forest Country Club on August 26, 2005. (*Id.* at 9, 60.)

---

[23] We do not suggest that deficient pleadings can be corrected in a party's Opposition to Summary Judgment papers. But, in reviewing the district court's order granting summary judgment, we look to the Appellants' Opposition to Summary Judgment because it contains the arguments presented to the district court. *See United States v. Oakley*, 744 F.2d 1553, 1556 (11th Cir. 1984) ("[A]n appellate court, in reviewing a grant of summary judgment, can only review the matters presented to the district court.") (citation omitted).

Having identified the tortious conduct underlying the Appellants' three assault and battery claims, we next look to see whether there is record evidence that Home Depot had "actual knowledge" of the tortious conduct. We need not reach the issue of whether Calhoun was the correct person to notify about this conduct, as there is no evidence in the record that the Appellants actually told Calhoun about the tortious conduct now underlying the assault and battery claims. The conduct underlying two of the claims, Cavaluzzi's belly rub of Corbitt, and the neck and shoulder massage of Raya at Lake Forest Country Club, occurred in August 2005. The Appellants argue that their April and June 2005 discussions with Calhoun gave Home Depot "actual knowledge" of Cavaluzzi's August 2005 conduct. Home Depot, however, could not have had "actual knowledge" of Cavaluzzi's August 2005 tortious conduct based on the Appellants' discussions with Calhoun at least two months *prior* to the tortious conduct. Additionally, there is no evidence that Raya ever told Calhoun during his April 2005 conversation with her about the March 2005 leg rub. In his deposition, Raya does not say that he told Calhoun about the leg rub. (*See* R.111 at 23.) And, Calhoun, when discussing what Raya told her in April 2005, says nothing of the leg rub. (*See* R.93 at 17-18.) There is no evidence, therefore, that either Raya or Corbitt told Calhoun in April or June of 2005 about the conduct underlying their assault and battery claims.

61

Because there is no evidence in the record that the Appellants actually told Calhoun in April and June of 2005 about the tortious conduct underlying their assault and battery claims, we conclude that the Appellants have not shown that Home Depot had "actual knowledge" of the tortious conduct, and thus ratified the alleged assaults and batteries of its employee, Cavaluzzi. Accordingly, the district court properly granted Home Depot summary judgment on the assault and battery claims.

*2. Invasion of Privacy*

The court granted summary judgment on the invasion of privacy claim on the ground that the alleged conduct did not rise to the level of an invasion of privacy tort under Alabama law.

When reviewing a grant of summary judgment, we may affirm on any legal ground supported by the record, regardless of whether the district court relied on that ground. *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir. 1994) (citing *Davis v. Liberty Mut. Ins. Co.*, 525 F.2d 1204, 1207 (5th Cir. 1976)). Accordingly, we affirm the grant of summary judgment on the ground that the Appellants have failed to state a claim for invasion of privacy. Indeed, the parties and district court have hinted that the true dispute at the summary judgment stage was whether the Appellants had failed to state a claim. (R.86 at 46) (Home Depot's Motion for Summary Judgment argues that "Plaintiffs' *allegations* fail to" constitute an invasion of privacy.) (emphasis

added); (R.141 at 35) (District court's Order holding that "*alleged* conduct is insufficient" and so the claim is "dismissed on this basis.") (emphasis added); (Appellee's Br. at 44) (District court "properly found that the Plaintiffs' *allegations* failed" to constitute an invasion of privacy.") (emphasis added).[24]

We have held that a Complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 958 (11th Cir. 2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553, 127 S. Ct. 1955, 1965 (2007)). Dismissal for failure to state a claim is proper if the factual allegations are not "enough to raise a right to relief above the speculative level." *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007) (*quoting Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965). In this case,

---

[24] Although we can affirm for any reason, even one not relied on by the district court, *McCabe*, 12 F.3d at 1560, or on a ground not argued before the district court, *Bauer v. United States*, 45 F.3d 44, 46 (5th Cir. 1979), the dissent would reverse on the ground that Home Depot has waived or abandoned its defense of failure to state a claim. While we agree with the dissent that *Blue Cross & Blue Shield of Ala v. Sanders*, 138 F.3d 1347 (11th Cir. 1998) and *McGinnis v. Ingram Equip. Co., Inc.*, 918 F.2d 1491, 1494 (11th Cir. 1990) hold that an *appellant's* waiver or abandonment of the defense of failure to state a claim can preclude our review of the merits of that defense, those cases do not address the power of an appellate court to affirm for any reason. Additionally, we disagree with the dissent that the parties and district court used "allegations" synonymously with "record evidence." Because the parties and the district court repeatedly discussed whether the allegations of invasion of privacy were sufficient, and because the defense of failure to state a claim was properly asserted under Rule 12(h)(2), we disagree with the dissent's view that affirming because the pleadings fail to state a claim for invasion of privacy would constitute an unjust or unfair surprise to the Appellants.

the Appellants have not alleged any factual support for their invasion of privacy claim, and therefore dismissal for failure to state a claim is appropriate.

The Appellants' Complaint merely states:

58. Invasion of Privacy: The conduct of Home Depot's agent, Cavaluzzi, constituted a wrongful intrusion and invasion of the [Appellants'] privacy. Cavaluzzi's wrongful acts were committed in the line and scope of the [sic] his employment with Home Depot; or Cavaluzzi's wrongful acts were committed in furtherance of the business of the Home Depot; or Home Depot participated in, authorized, or ratified such wrongful acts.

(R.1 at 15.) The Second Amended Pretrial Order is no more helpful than the Complaint, as it provides as the factual basis for the invasion of privacy claim: "All admissible facts relevant to whether Mr. Cavaluzzi intentionally intruded physically or otherwise, upon the solitude or seclusion of the Plaintiffs or their private affairs or concerns." (R.135 at 27.) Because the Appellants have failed to allege what the factual basis is for their invasion of privacy claim, we conclude that they have failed to state a claim upon which relief can be granted, and thus their claim should have been dismissed. On that basis, we affirm the district court's grant of summary judgment.

### 3. *Outrage*

The outrage claim suffers from the same pleading deficiencies as the invasion of privacy claim. In addition to failing to allege a factual basis for the claim, the

64

Appellants have failed to present any evidence of one necessary element of this tort: severe emotional distress. Absent evidence of severe emotional distress, summary judgment must be granted. *McIsaac v. WZEW-FM Corp.*, 495 So. 2d 649, 651 (Ala. 1986). Therefore, we affirm the grant of summary judgment to Home Depot on the Appellants' claim of outrage.

## IV. CONCLUSION

Based on the foregoing, we REVERSE the grant of summary judgment to Home Depot on Corbitt and Raya's Title VII claim of retaliation. We AFFIRM the grants of summary judgment on the claim of hostile work environment sexual harassment, as well as on the state law claims of assault and battery, invasion of privacy, and outrage. We REMAND for further proceedings consistent with this opinion.

**REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.**

FAWSETT, District Judge, concurring in part and dissenting in part:

While I join Parts I, II, and III.B of the majority opinion, I respectfully dissent from Part III.A concerning the hostile work environment sexual harassment claim and those portions of Part III.C which concern the Alabama tort claims of assault and battery and invasion of privacy.[25] Regarding the former section, the majority decides factual matters which should be reserved for jury determination. With respect to the latter section, the majority disposes of the state law claims on an improper and inequitable procedural basis without permitting the Appellants the opportunity to cure the technical defects found in the complaint.

## I. *Hostile Work Environment Sexual Harassment*

When deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986). As explained by the United States Supreme Court:

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment

---

[25] I concur with Part III.C as to its disposition of the claim of outrage due to the lack of record evidence of severe emotional distress.

or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.

*Id.* at 255, 106 S. Ct. at 2513 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S. Ct. 1598, 1608-09 (1970)). Therefore, "[i]f a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Educ. for Bibb County, Ga.*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citing *Samples ex rel. Samples v. City of Atlanta, Ga.*, 846 F.2d 1328, 1330 (11th Cir. 1988)). The substantive law identifies which facts are material to a given cause of action. *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

Title VII prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). As the Supreme Court has explained, "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993) (citation and quotation marks omitted). To determine whether the challenged conduct constitutes sexual

harassment, a court should consider the conduct in context, rather than as separate and isolated acts, and determine "under the totality of the circumstances" whether it is "sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc) (citing *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997)).

The majority begins its analysis of the Appellants' sexual harassment claims by first eliminating from its consideration statements and conduct that it deems not to be of a sexual or gender-related nature. According to the majority, most of Cavaluzzi's complained-of conduct constitutes mere compliments or flirtations which are not actionable under Title VII. However, Cavaluzzi's conduct should not so easily be cast in this light.

According to the record evidence both Appellants stated that shortly after Cavaluzzi was assigned to their district, he began harassing them with telephone calls relating to business which then degenerated into inappropriate sexual comments and suggestions. Cavaluzzi's behavior then escalated into repeated telephone calls filled with sexually suggestive comments, with the addition of a pattern of inappropriate touchings on occasions when Cavaluzzi was in a meeting attended by the Appellants or when Cavaluzzi visited these managers' respective Home Depot stores. The

68

touchings, although intermittent and opportunistic, were again followed with constant telephone calls of a sexual nature to each store manager. These calls ranged from two to three times a week to twelve times a week during the period from March, when Cavaluzzi arrived in their district, into November of 2005, shortly before both Appellants were fired. After the initial calls, Cavaluzzi discussed no business and repeatedly made sexually suggestive comments to these subordinate employees. Although the majority concludes as a matter of law that most of these comments were mere flirtations, factual issues such as the overall context in which such comments were made, as well as Cavaluzzi's demeanor and intonation, preclude this determination.

Certainly there is a difference between a coworker cheerfully stating, "Hey, I really like your pants," and a coworker stating, "I really like *how you look* in those pants," coupled with several more overtly sexual comments. Similarly, a coworker's invitation to join him in a hotel room may be friendly and professional or may be laden with innuendo, particularly when such invitations have been repeatedly made and have been coupled with other sexually charged comments. Courts should be hesitant to supplant the role of jurors by making conclusions as to the proper interpretation of such facts.

In the instant case the record shows that Cavaluzzi made many statements that, when considered in isolation, could be interpreted as either merely complimentary or overtly sexual. The interpretation depends on the context. The majority, instead of viewing the evidence in the light most favorable to the non-moving parties and drawing all reasonable inferences in their favor, selects individual statements from among several made during a conversation or meeting, examines these statements out of context and in a vacuum, and then determines that they are not gender-related. The record, however, contains ample evidence from which a reasonable jury could determine that the comments of Cavaluzzi, when viewed in context, were part of a persistent effort to enter an unwelcomed sexual relationship with his subordinate employees and were not merely innocent, innocuous, flirtatious, or purely complimentary.

For example, Cavaluzzi said that he liked Corbitt's "baby face," that Corbitt was "small and cute," and that he liked the way Corbitt dressed. When viewed in isolation, such comments could be construed as merely complimentary. However, when these statement are viewed in context with other comments Cavaluzzi made during the same conversations, the sexual overtures of the statements becomes pronounced. For instance in these conversations, Cavaluzzi told Corbitt that Corbitt was not Cavaluzzi's "usual type" but he "could not stop thinking about" Corbitt, that

Cavaluzzi knew Corbitt was not gay but Cavaluzzi could show Corbitt how, and he would "like it." In addition, Cavaluzzi asked Corbitt if he "wore boxers or briefs or nothing," and if Corbitt colored his hair, remarking that it must be Corbitt's "natural color down there too." He asked Corbitt if he "wasn't bored with the same woman," referring to Corbitt's wife, asked if Corbitt and his wife "swing," and told Corbitt to visit specified gay websites, saying Corbitt "should look at them" so Corbitt "could see what he is talking about."

Similarly, Cavaluzzi called Raya several times a week asking such things as what Raya was wearing and if he was wearing the pants that Cavaluzzi liked. Cavaluzzi stated that Raya "always dressed so nice," "was cute," and had beautiful hair. These statements, when examined alone, could be deemed mere flirtations; however, the record reflects such comments were accompanied by Cavaluzzi telling Raya, "I like the rough look," and "you're the Italian heifer that I like." When viewed in context an inappropriately gender-based and sexual meaning may be reasonably inferred from such statements. This inference is strengthened by the pervasive and repetitive nature of Cavaluzzi's comments as well as his inappropriate touchings of his two subordinate employees.

The true import of any statement is not clear without context. As the Supreme Court has instructed:

71

In same-sex (as in all) harassment cases, [the severe or pervasive] inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target. . . . The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships *which are not fully captured by a simple recitation of the words used or the physical acts performed*. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82, 118 S. Ct. 998, 1003 (1998) (emphasis added); *see also Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1109 (9th Cir. 1998) ("Discriminatory behavior comes in all shapes and sizes, and what might be an innocuous occurrence in some circumstances may, in the context of a pattern of discriminatory harassment, take on an altogether different character, causing a worker to feel demeaned, humiliated, or intimidated on account of her gender."). The record in the instant case reveals a multitude of inappropriate, sexually-based comments made by Cavaluzzi to the claimants in this case. Select comments, pulled from their context and deemed facially inoffensive by the majority, demonstrate an impermissible sex bias when viewed in context. In finding otherwise, the majority weighs the evidence, disregards context, and violates a basic tenet of summary judgment jurisprudence by drawing inferences from the selected facts in favor of the movant-Appellee rather than in favor of the nonmovant-Appellants.

In addition, the majority dismisses some of the challenged touchings as not sexual in nature. For instance, the majority concludes that Cavaluzzi putting his arm around Raya is not sexual and states, "if a heterosexual man had done this, Raya would likely not have thought anything of it." The majority glosses over the fact that at the same time Cavaluzzi put his arm around Raya's shoulders, he put his hand on Raya's thigh under a table where they were seated and where others who were present ostensibly could not see. Both Appellants reasonably interpreted Cavaluzzi's conduct toward them as solicitations for sex and feared being fired if they complained. The majority also glosses over the number of touchings and the full body hug given by Cavaluzzi to Raya in which Cavaluzzi pushed himself into Raya's "privates." Moreover, Cavaluzzi's conduct towards Raya caused other store managers in the region to start calling Raya "Lenny's Bitch," which suggests that the conduct was in fact sexual in nature to other observers. In any event, a reasonable jury could reach this conclusion.[26]

---

[26] The record reveals that in late March of 2005, during a regional managers' meeting, Cavaluzzi came up to both Appellants and began playing with their hair and rubbing their shoulders, giving them "something akin to an intimate massage." Later that evening Corbitt was in his car, and Cavaluzzi reached in and massaged Corbitt's neck and shoulders, inviting him to Cavaluzzi's hotel room for drinks. Around the same time, Cavaluzzi entered a room in which Raya was seated at a table with another employee, sat down next to Raya, put his left arm on Raya's shoulder, and then at the same time put his right hand on Raya's thigh under the table. In late April of 2005, Cavaluzzi approached Raya from behind and ran his fingers through Raya's hair in front of other regional managers. At this point, the other managers began referring to Raya as "Lenny's Bitch." At a store
(continued...)

73

Next, the majority determines that the conduct in question is not so severe or pervasive as to constitute actionable harassment. In reaching its decision, the majority concludes that the Appellants in their sworn answers to interrogatories exaggerate the number of times that Cavaluzzi harassed them. This is one inference that may be derived from the record. However, another reasonable inference is that the conduct occurred exactly as many times as the Appellants contend that it did. A trial by jury is the appropriate forum to choose which inference to draw from the record. This issue should not be decided by a court as a matter of law by rejecting sworn testimony of record as unworthy of belief on a motion for summary judgment.

After whittling down the conduct of Cavaluzzi that it would consider in its analysis, the majority concludes that the conduct alleged by the Appellants is

---

[26] (...continued)
opening in June, Cavaluzzi gave Raya a full body hug, and started massaging Raya's back. During this hug, Cavaluzzi pressed his whole body against Raya such that Cavaluzzi's body was touching Raya's "privates" during the hug. During the first week of August, Corbitt was working alone in the training room of the Montlimar store when Cavaluzzi "snuck up" behind him, put one of his hands on Corbitt's shoulder, and rubbed Corbitt's stomach with the other. At the end of August, during a managers' meeting, Cavaluzzi came up behind Raya while Raya was seated. Cavaluzzi began massaging Raya's neck and shoulders while commenting that Raya was in good shape and felt muscular and trim. Finally, in November, Corbitt attended a meeting with Cavaluzzi and two other managers during which Cavaluzzi gave Corbitt a full body hug and rubbed his back, neck, head, and shoulders. Thus, the record reveals, in addition to the constant, sexually-charged phone calls, evidence of Cavaluzzi touching Corbitt at least four times and Raya at least five times in what a reasonable jury could find to be a sexual manner.

"probably" not more severe than the conduct alleged in *Gupta*[27] and *Mendoza*.[28] According to the majority, certain of Cavaluzzi's comments may have been "relatively severe," but most of these comments were not sex-based. Therefore, the majority concludes that under an objective standard, "Cavaluzzi's alleged sexual harassment was not sufficiently severe or pervasive to support a hostile work environment claim . . . ." I respectfully disagree.

The conduct in this case goes well beyond "ordinary socializing in the workplace." The Appellants found Cavaluzzi's conduct offensive, and several of their peers in management testified that they found the conduct to be offensive. While the law utilizes an objective standard to evaluate hostile work environment claims, this standard is justifiable only if it accurately reflects real-life workplace conditions and expectations. When the objective "reasonable person" standard becomes so divorced from reality that a reasonable person can be *unreasonably* subjected to discriminatory conduct under the case law, the courts cease to give effect to the statutory language and the remedial purpose of Title VII.

The record provides evidence from which a reasonable jury could conclude that the Appellee's regional human resources manager engaged in conduct which

---

[27] *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571 (11th Cir. 2000), *abrogated on other grounds as recognized in Crawford v. Carroll*, 529 F.3d 961, 973-74 (11th Cir. 2008).

[28] *Mendoza*, 195 F.3d 1238.

constituted sexual harassment and created an unreasonably hostile work environment for two of his store managers.  Because the majority opinion improperly removes the resolution of factual matters from the jury, I dissent from Part III.A of the opinion.

## II.    *State Law Claims of Assault and Battery and Invasion of Privacy*

The majority concludes that: (1) summary judgment should be affirmed on the state law claims of assault and battery because of the lack of record evidence of ratification of Cavaluzzi's conduct by Appellee, and (2) summary judgment should be affirmed on the invasion of privacy claim because the majority is unable to discern a factual basis for the claim and Appellants have failed to state a claim.  Because the record provides evidence of Appellee's ratification of Cavaluzzi's assaults and batteries as well as support for the invasion of privacy claim, I must dissent.

On the one hand, the majority explains its decision affirming summary judgment on the state law claims by describing these claims as shotgun pleadings which make it "impossible to determine the factual basis for each claim"; on the other hand, the majority disclaims using shotgun pleadings as a basis for its decision and finds it has "no occasion to decide whether shotgun pleading is in and of itself an appropriate basis for affirming the grant of summary judgment on any of the claims." The majority opinion states that summary judgment was properly granted on the invasion of privacy claim because the majority is "not able to discern the factual

76

basis" for the claim. This is a hallmark of shotgun pleading analysis. Thus, despite its proclamations to the contrary, the majority appears to affirm the grant of summary judgment on the basis of shotgun pleading.

This Circuit has previously held that the appropriate remedy for shotgun pleadings is not to dismiss the complaint but instead is to strike the complaint and order a more definite statement. *Magluta v. Samples*, 256 F.3d 1282, 1284-85 (11th Cir. 2001).[29] For instance, in a case cited by the majority, *Cesnik v. Edgewood Baptist Church*, 88 F.3d 902, 910-11 (11th Cir. 1996), the Court vacated summary judgment and remanded the claims found to constitute shotgun pleadings to the district court with instructions to require the plaintiffs to replead.[30] Based on this precedent, it is inappropriate to *dismiss* the state law claims and affirm summary judgment on the basis of a "shotgun pleading." Instead, the proper remedy would be to vacate summary judgment on count three and remand to the district court with directions to strike the state law claims and order the Appellants to replead.

[29] As demonstrated by *Wagner v. First Union Pharm. Corp.*, 464 F.3d 1273, 1279-80 & n.7 (11th Cir. 2006), *Magluta* appears to remain the applicable law governing the appropriate treatment of shotgun pleadings even after this Circuit's decision in *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) (en banc) (finding a district court had no duty to *sua sponte* grant leave to amend a complaint upon dismissal of the complaint).

[30] The rule against shotgun pleadings addresses the problem of unclear, vague, or convoluted pleadings which prevent a court from readily determining whether the pleadings state a claim. The remedy of ordering a more definite statement directly addresses this problem, directs the plaintiff to more clearly state its allegations, and then provides the court an opportunity to evaluate whether more artfully drafted pleadings state a claim for which relief may be granted.

Particularly at the summary judgment stage this result would be the more equitable approach to the problem of inexact pleading to avoid wasting the large amount of discovery already completed in this case.

In addition, the majority's approach does not reflect the realities of federal litigation. A significant portion of complaints filed in federal court could, in whole or in part, meet the definition of "shotgun pleading." Nevertheless, where the meaning of the complaint is reasonably discernable, parties and courts tend to proceed to discovery. Regardless of the propriety of this practice, affirming summary judgment on the issue of "shotgun pleading" gives the defendant an incentive to forego this pleading challenge at the proper stage and instead use it as insurance against a district court ruling that is either adverse to it or favorable yet susceptible to reversal on appeal. This gives defendants an unfair trump card to use throughout the entire litigation, regardless of the procedural posture of the case or the development of the record.

In the instant matter, the Appellee had an opportunity to raise a challenge to the sufficiency of the pleadings through a motion to dismiss or strike but did not file such motion with the district court. While the Appellee raised the affirmative defense of failure to state a claim in its answer, this was one of fourteen boilerplate defenses in the responsive pleading and was not asserted in a separate motion under Federal Rule

78

of Civil Procedure 12(b). Instead, the case proceeded on the complaint through discovery, resulting in the development of a record which supplements and supports the allegations of the complaint.[31] It is unjust to turn a blind eye to this evidentiary record and dismiss the case on a technical pleading violation.

This result is particularly unfair since the Appellants had no prior notice that the affirmative defense of failure to state a claim would be considered on appeal. Indeed, this Circuit has previously stated, "we will not decide whether the plaintiff failed to state a claim unless the defendant preserved that defense in the district court pursuant to Fed. R. Civ. P. 12(h)(2)." *Blue Cross & Blue Shield of Ala. v. Sanders*, 138 F.3d 1347, 1354 (11th Cir. 1998) (citations omitted); *see also McGinnis v. Ingram Equip. Co., Inc.*, 918 F.2d 1491, 1494 (11th Cir. 1990) (en banc) (finding a boilerplate assertion of the defense to have been abandoned when not raised in any motion and not incorporated into the pretrial order). Rule 12(h)(2) permits a party to raise this defense through pleading, by motion under Rule 12(c), or at trial. Although the Appellee asserted the defense in its answer, the defense was not specific to any particular claim. Surely if the Appellants' complaint is considered insufficient to

---

[31] For example, the record reveals ample evidence supporting the Appellants' claim for invasion of privacy: Cavaluzzi repeatedly asked sexually suggestive questions about the Appellants' marriages, apparel, bodies, sexual activities, and personal grooming habits. Such inquiries constitute intrusions into the Appellants' privacy under Alabama law. *See, e.g., Ex parte Atmore Cmty. Hosp.*, 719 So. 2d 1190, 1194 (Ala. 1998); *McIsaac v. WZEW-FM Corp.*, 495 So. 2d 649, 651 (Ala. 1986); *Phillips v. Smalley Maint. Servs., Inc.*, 435 So. 2d 705, 708-09 (Ala. 1983).

provide proper notice of their state law claims, the statement "[w]ith respect to some or all of [the Appellants'] claims, [the Appellants'] Complaint fails to state a claim upon which relief may be granted" in the answer is insufficient to provide proper notice of this affirmative defense.

In addition, the Appellee did not raise the issue of failure to state a claim in any motion or argument to this Court or the court below. The Appellee refers to the sufficiency of the Appellants' "allegations" in its motion for summary judgment and briefs on appeal, but it does so in relation to all of the Appellants' claims and appears to treat the term synonymously with "record evidence."[32] The words "shotgun pleading" or "failure to state a claim" appear nowhere in the filings of the parties on summary judgment or on appeal. Because the defense of failure to state a claim was not previously raised in a manner providing adequate notice to the Appellants, it should be deemed abandoned and not utilized as a basis to affirm summary judgment.

Moreover, the record reflects that the litigation below had proceeded well

---

[32] For instance, in its motion for summary judgment, the Appellee discusses Corbitt's and Raya's "allegations" of harassment and proceeds to cite record evidence as examples of these "allegations." (R.86-3 at 4-9, 13-16; *see also id.* at 28 ("Accepting [Appellants'] allegations as true, for purposes of this motion only, the alleged conduct does not rise to the level of severity or pervasiveness required within this Circuit.").) The Appellee includes similar terminology in its Brief on Appeal, using the word "allegations" to describe the record evidence and to argue that this evidence does not meet the applicable legal standard. (Appellee's Brief at 24-25, 27-29, 42-45.) In fact, in its statement regarding oral argument, Appellee describes the state law issue as follows: "[Appellants] could not *prove* state law claims of outrage or invasion of privacy or that Home Depot ratified the alleged actions of the harasser." (*Id.* at ii (emphasis added).)

beyond the pleading stage, was set for trial, and the parties had appeared before the trial judge for a pretrial conference. The issue of a shotgun pleading was not raised at the pretrial conference and was not incorporated into the pretrial order. Thus, the Appellee's motion for summary judgment, the trial court's order on the motion, and the arguments of the parties on appeal provided the Appellants with notice only that the evidence underlying their claims was at issue. The Appellants did not have notice that the technical sufficiency of their pleadings could be dispositive of their claims at this stage of the litigation.

The majority does appear to delve briefly into the record to conclude that the Appellee did not ratify Cavaluzzi's assaults and batteries of the Appellants because it had no actual notice of this conduct. To the contrary, the record demonstrates that the Appellants spoke with several Home Depot managers and human resources personnel on multiple occasions to complain about Cavaluzzi's conduct, beginning in April of 2005 for Raya and June of 2005 for Corbitt. The district manager and at least two store human resources managers were directly apprised of the inappropriate sexual harassment of the Appellants by Cavaluzzi. Additionally, a number of members of management and human resources *actually witnessed* Cavaluzzi's

touchings and inappropriate comments.[33] These persons were designated under Home Depot's policy to receive and correct complaints of harassment; therefore, their knowledge of Cavaluzzi's conduct also may be attributed to Home Depot for purposes of the state law claims. *See Mardis v. Robbins Tire & Rubber Co.*, 669 So. 2d 885, 889 (Ala. 1995) (indicating that a complaint to a plant personnel manager would constitute notice to the employer of harassing conduct); *Breda v. Wolf Camera & Video*, 222 F.3d 886, 889-90 (11th Cir. 2000) (finding in a Title VII case that an employer's notice of harassing conduct is established when the employee reports the conduct to a designated person set forth in the employer's anti-harassment policy). A reasonable jury could determine from this evidence that Home Depot had actual knowledge of the assaults and batteries.

In its analysis, the majority improperly narrows the issue actually raised on appeal by stating that "[t]he only argument Appellants make on appeal that Home Depot had 'actual knowledge' of the assaults and batteries is that there is record evidence that Appellants told Calhoun about them in April and June of 2005." Rather, the issue as stated by Appellants is: "The Trial Court erred by not recognizing

---

[33] Further complaints about his conduct were made directly to Cavaluzzi, the person designated by Appellee to enforce its human resource policies throughout the district. The record reflects that Cavaluzzi has been transferred by Appellee to Appellants' district after he had violated a Home Depot's policy by having an inappropriate relationship with a subordinate employee.

the Home Depot store managers and store HR managers as appropriate representative[s] to receive and to discern sexual harassment complaints." (Appellants' Brief at 28.) This is identical to the issue of the knowledge of members of Home Depot management and human resources personnel developed in greater detail in the portion of the Appellants' Brief addressing the *Faragher* defense to sexual harassment claims.[34] (*Id.* at 18-20.)

The majority also states, "We need not reach the issue of whether Calhoun was the correct person to notify about this conduct, as there is no evidence in the record that the Appellants actually told Calhoun about the tortious conduct now underlying the assault and battery claims." First, the Appellants offered evidence that they told Calhoun of Cavaluzzi's inappropriate behavior, and a jury could reasonably infer that these conversations included discussions of Cavaluzzi's alleged assaults and batteries. Secondly, this statement by the majority completely ignores the record evidence that Calhoun *actually witnessed* this conduct. Thus, I cannot concur with the majority opinion affirming summary judgment on these claims.

For these reasons, I respectfully dissent from the portion of Part III.C of the majority opinion which affirms summary judgment on the state tort claims of assault

---

[34] For example, with regards to the inappropriate conduct of Cavaluzzi, Appellants state that "at least eight Home Depot store managers or store HR managers personally witnessed" such conduct. (Appellants' Brief at 18.)

and battery and invasion of privacy. I concur with the portion of Part III.C which affirms summary judgment on the claim of outrage based on the lack of evidence in the record demonstrating severe emotional distress.